UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| TUTOR TIME LEARNING CENTERS, LLC, | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| LARZAK, INC., DARCY GRIFFIN, and RICHARD GRIFFIN, | ) | |
| Defendants | ) | |
| ********************************************* | | CAUSE NO. 3:05-CV-322 RM |
| LARZAK, INC., | ) | |
| Counter-Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TUTOR TIME LEARNING CENTERS, LLC, | ) | |
| Counter-Defendant | ) | |

<u>OPINION and ORDER</u>

The claims in this action relate to the operation of a child care center by Larzak, Inc. and Darcy and Richard Griffin under their franchise agreement ("the Agreement") with Tutor Time Learning Centers, LLC. After the Agreement expired, Tutor Time filed suit against Larzak and the Griffins alleging a breach of the Agreement's non-compete clause. Tutor Time claims Larzak and the Griffins established a similar child care center at the same location by using Tutor Time's confidential client lists and related franchise operating documents, all in violation of the Agreement's covenant not to compete. Larzak filed an amended counterclaim alleging Tutor Time's breach of the franchise agreement, the software

license agreement, and the site development agreement and violation of Indiana's Deceptive Franchise Practice Act, IND. CODE §§ 23-2-2.7-2(1)(i) and 23-2-2.7-2(2). Portions of the amended counterclaim – Larzak's claims relating to conduct occurring prior to July 19, 2002 – were dismissed in May 2006.

This cause is now before the court on Tutor Time's motion for partial summary judgment on the merits of its complaint and the remaining claims of the amended counterclaim, and its motion to strike portions of David Tasch's affidavit, filed by the defendants in support of their response to Tutor Time's motion. Also pending is the motion of Larzak and the Griffins for partial summary judgment in which they argue they should be awarded judgment on the claims in the complaint. Responses and replies have been filed, and the motions are ripe for review.

I. FACTUAL BACKGROUND

The relationship in this dispute began when Richard and Darcy Griffin saw an ad in Entrepreneur Magazine relating to a child care franchise. Although Mr. and Mrs. Griffin had no experience in the child care industry, they desired to establish a child care facility in their community and were attracted to the computer-based, age-specific curriculum offered by Tutor Time Child Care Systems, Inc. ("Child Care Systems"). In 1994, Mr. and Mrs. Griffin entered into a ten-year franchise agreement with Child Care Systems to operate a child care learning center in northwest Indiana, a software licensing agreement under which

2

Child Care Systems was to provide certain software programs, and a site development agreement under which Child Care Systems agreed to locate and assist in developing a site for the child care center. At that same time, Darcy and Richard Griffin each executed a personal guarantee relating to their obligations under the Agreement. In 1996, the Griffins assigned their interests in the Agreement to Larzak, Inc., in which the Griffins are the controlling shareholders. Larzak opened a Tutor Time child care learning center in Schererville, Indiana, in June 1997.

Child Care Systems filed for bankruptcy in May 2002. Tutor Time Learning Centers, LLC ("Tutor Time") purchased its assets, including the franchise agreement with Larzak, through a bankruptcy sale on July 19, 2002, and the parties continued to operate under the Agreement. Larzak claims Tutor Time didn't provide upgraded software, the center's electronic entry cards weren't secure, and support and assistance from Tutor Time personnel was insufficient. During the ten-year term of the Agreement, neither party notified the other of a breach of any of the terms of the Agreement or sought early termination of the Agreement.

Tutor Time learned some months before the Agreement's expiration date that Larzak wouldn't be renewing the franchise agreement. Tutor Time's counsel wrote to the Griffins' counsel reviewing various terms relating to the Agreement's termination, including the return of proprietary property and franchise materials, payment of amounts owed, de-identification of the center, and compliance with

the non-compete clause. The franchise agreement expired by its own terms on November 7, 2004.

The day after the expiration of the Agreement, Larzak opened Premier Child Care/Learning Center at the same Schererville location the Tutor Time center had occupied. The following month, Barbara Wheeler, Tutor Time's district manager, visited Larzak's premises to check Larzak's compliance with de-identification of the Tutor Time center. The Premier center was using a different computer program and new signage had replaced the Tutor Time signage on the center and on Larzak's vans, but Ms. Wheeler noted no change with respect to the playground and the interior of the building. The color and floor tile schemes remained unchanged from those required by the franchise agreement. Ms. Wheeler retrieved various Tutor Time manuals, handbooks, and software, and Larzak personnel told her that Tutor Time marketing materials had been forwarded to another franchisee in the Tutor Time system.

Ms. Wheeler visited the Larzak premises again two years later and discovered that Larzak had retained possession of Tutor Time curriculum information manuals, staff meeting manuals, an employee handbook, and a songbook. Larzak maintains retention of the materials was inadvertent and unintentional and it made no use of those materials. Tutor Time says Larzak employee Sarah Johnson copied for Premier's use certain of the Tutor Time forms and retyped the forms to substitute the Premier name for that of Tutor Time, all at Darcy Griffin's direction.

4

Tutor Time filed suit against Larzak and the Griffins, alleging an "intentional, direct, and material" breach of various provisions of the franchise agreement and the Nondisclosure and Noninterference Agreement. In addition to an award of attorney fees, and costs, Tutor Time seeks an injunction enjoining Larzak and the Griffins from operating a child care business in the restricted area for a period of two years, a finding of personal liability on the part of Richard and Darcy Griffin pursuant to the terms of their personal guarantees, an award of lost profits from Larzak, and specific performance by Larzak. Tutor Time has moved for summary judgment on its claims against Larzak and the Griffins and on the remaining claims of Larzak's amended counterclaim.

Larzak and the Griffins respond that the entire Agreement is unenforceable based on breaches by Tutor Time and Child Care Services. They say, too, that Tutor Time doesn't have a legitimate protectible interest so the restrictive covenant of the franchise agreement is invalid and unenforceable, entitling them to judgment on Tutor Time's complaint. Larzak also maintains the remaining claims of its counterclaim are still viable and summary judgment for Tutor Time on the counterclaim is inappropriate.

## II. Relevant Provisions of the Franchise Agreement

### (a) Covenant Not to Compete

The Agreement's provisions relating to the non-compete clause read as follows[1]:

> *12.5 Post Agreement Covenant Not to Compete.* The Franchisee acknowledges that the trademarks, the business reputation and good will associated with the Franchisor, the methods, materials and techniques employed by the Franchisor, the training and instruction to be provided under this Agreement, the knowledge of the services and methods unique to the Franchisor, and the opportunities associated with being part of the Franchisor's development of a nationwide franchise system are of considerable value. In consideration of this and in consideration of protection for itself and other individual franchisees, as well as the total franchise System, the Franchisee acknowledges and agrees that, in the event of termination or expiration of this Agreement, the Franchisee shall not thereafter engage, either directly or indirectly as principal or employee, alone or in association with others, in a child care business similar to the subject Franchise. This restriction shall apply only within the time limits and geographical restrictions and limitations on enforcement set out in applicable state law as follows:

> *12.5.1* Within ten (10) miles of the Franchise Location developed pursuant to this Franchise Agreement for a period of two (2) years following termination of this Franchise Agreement; and,

> *12.5.2* Within ten (10) miles of any other existing Franchise Location of the Franchisor or of any other []Franchisee for a period of two (2) years from date of termination of this Franchise Agreement.

---

[1] The Agreement also contains a severability clause relating to the covenant:
*12.7 Severability.* It is the express mutual intent of the parties that the benefits of this covenant not to compete be realized in exchange for the consideration to be received by virtue of this Agreement. Therefore, if any aspect of the above stated restriction is inconsistent with the applicable law governing this Agreement, the parties request that the terms be modified only to the extent necessary to meet the requirements of such law, while preserving the intent of this covenant not to compete.

> The above restrictions shall not apply where the Franchisor is in default for cause and the Agreement is terminated by a non-appealable final order of a court of competent jurisdiction. The provisions of this Subparagraph shall survive the expiration or termination of the Franchise Agreement for any reason.

The Addendum to the Franchise Agreement amended Paragraph 12.5 to include

the following:

> To the extent required by applicable Indiana law, this section shall not in any way abrogate or reduce any rights of the franchisee as specifically provided in the Indiana Deceptive Franchise Practices Law.

### (b) Proprietary Materials

The Agreement contains provisions addressing franchise materials provided

to the franchisee:

> *12.6 Proprietary Materials.* The Franchisee further agrees that no use of any kind will be made of proprietary property of the Franchisor (including intellectual property, business information, sales methods and devices, customer lists, etc.) for the longer of: (i) a period of two (2) years following termination for non-confidential information; and (ii) the full period of times in which such proprietary property remains confidential by other Franchisees for the purposes of providing a competitive edge and trade secret advantage. This provision shall not be construed as post termination license of the Franchisor interest.

> *15.2 Return of Materials.* The Franchisee agrees that upon the termination or expiration of this Agreement, the Franchisee will immediately return to the Franchisor Confidential Operating Manual, Curriculum Manuals, and any copies or reproductions of the Confidential Operating Manual, which has been loaned to the Franchisee by the Franchisor. The Franchisee shall be required only to turn over any true copies of all business records so long as original records of entry are available for final inspection and audit by the Franchisor or its agent upon reasonable notice in the Franchisee's possession, and all copies of such items, and shall retain no copy or record of any confidential materials pertaining to the Franchise,

excepting only the Franchisee's copy of any correspondence between the parties, and any other documents which the Franchisee reasonably needs for compliance with any provision of law.

*(c) Duties and Responsibilities of the Franchisor*

The following paragraph of the Agreement addresses the issue of continuing

assessment:

*8.3 Continuing Assistance.* The Franchisor shall provide continuing assistance to the Franchisee in the development and operation of the Franchise Center by means of periodic visits by a field representative of the Franchisor and by the maintenance of the office staff at the Franchisor's headquarters. The Franchisor shall make itself available for consultation on such matters as operations, advertising and promotion, and business methods from time to time without any additional charge to the Franchisee. For the purpose of this Subparagraph 8.3, periodic visits shall be at the discretion of the Franchisor; however, the Franchisee may request in writing additional support either on-site or by other communication means to be reasonable at all times, for which the Franchisor shall make itself available in a reasonable time frame at the Franchisee's request.

*(d) Notice Provisions*

The following provisions of the Agreement govern notice:

*13.3 Termination by Franchisee.* In the event that Franchisor breaches this Franchise Agreement and fails to cure such breach within thirty (30) days after written notice of Franchisee's intent to terminate is delivered to the Franchisor, then the Franchisee may terminate this agreement for cause and shall have all the remedies at law and equity available to it. The franchisee may not terminate this agreement in any other way or manner.

*19.9 Notices.* Any and all notices required or permitted under this Agreement shall be written and shall be personally delivered by certified or registered mail to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party. Notice by mail shall be deemed

8

received on the third business day following the date mailed. Either party may change the name and address for notices by written notification served to the other party in accordance with this paragraph.

### (e) Actions at Termination

Section 15 sets forth specifics relating to termination or expiration of the

Agreement:

*15.3 Actions at Termination.* The Franchisee agrees that upon the termination or expiration of this Franchise Agreement, the Franchisee will:

*15.3.4 Disassociation.* Take all necessary steps to disassociate itself from the Franchisor;

*15.3.5 Telephone Assignment.* Cease using the telephone listing and number previously used by the Franchise Center, and use its best efforts to have the listing assigned to the Franchisor or its designee pursuant to the power of attorney attached as Exhibit "C";

*15.3.7 Conversion of Business.* Upon termination for default and in addition to compliance with the other provisions of Section 15 of the Franchise Agreement, the Franchisee shall have the following options, one of which must be fully complied with within six (6) months of termination:

(i) Operate the child care center under a name substantially different from the trade name "Tutor Time" and prepay the remaining amount of Royalty Fees and Advertising Contributions due for the remainder of the initial term or succeeding term, as the case may be, applying a present value discount factor equal to the difference between: (i) the annualized inflation rate index for consumer items; and (ii) the "Prime Rate" as published in *The Wall Street Journal*, both as of the end of the month preceding the event of default in assuming the amount of Gross Revenues will continue at the historic trend. In addition, the Franchisee shall be required to redesign the physical facility to be substantially different than a Tutor Time layout as well

9

as remove all systems of the Franchisor, including but not limited to the Village™, and Safe N Sound™ Software, including but not limited to Curriculum, etc. The Nondisclosure and Noninterference Agreements, except as otherwise described in this Subparagraph, shall survive termination.

       (ii) Convert the location to a use other than a child care center; or

       (iii) Sell the land, building, equipment, and other personal property, if owned by the Franchisee, to a third party, subject to the Franchisor's right of first refusal. The deed, lease, or other instrument of transfer of the real property shall contain a covenant stating that the real property may not be operated as a child care center for a twenty-four (24) month period from the date of termination.

15.4   *Termination of Franchise Agreement.* The Franchisee acknowledges and agrees that upon the termination or expiration of this Agreement, the Franchisee shall have no interest in this Agreement or in the rights granted in this Agreement. The Franchisee further acknowledges and agrees that the Franchisee shall not be entitled to receive any payment or adjustment whatsoever from the Franchisor for any good will the Franchisee may have established either prior to or during the term of this Agreement and any extension or renewal of this Agreement.

### *(f) Nondisclosure and Noninterference Agreement*

The relevant portions of the Nondisclosure and Noninterference Agreement

read as follows:

       1.  The Disclosee may have received or been given access to, or will receive or be given access to, certain Confidential Information and trade secrets of the Franchisor and/or the Franchisee, all relating to or useful in the Franchisee's business and all labeled, treated as, or otherwise considered by the Franchisor and/or the Franchisee as confidential or proprietary information (collectively, the "Confidential Information"). The Confidential Information includes operating, marketing, promotions, advertising, human resources and training manuals; memoranda, video and audio tapes, slide presentations and

other materials; recipes; programs, studies, Software, inventory control, memoranda, agreements, correspondence, records, plans and reports used or created by the Franchisee or supplied to the Franchisee by the Franchisor; know-how; customer lists; identities of suppliers, recruiting techniques; and operation, accounting and quality control procedures.

*     *     *

    3. The Confidential Information is the exclusive property of the Franchisor. Upon request by the Franchisee, and in any event upon termination of the Disclosee's employment by, or ownership of, the Franchisee, the Disclosee shall turn over to the Franchisee all documents or other materials in the Disclosee's possession or under the Disclosee's control which may contain or be derived from Confidential Information, together with all documents, notes, or other work product which is connected with or derived from the Disclosee's services to, or affiliation with, the Franchisee. The Disclosee shall have no proprietary interest in any of the work product developed or used by the Disclosee and arising out of the Disclosee's employment by, or ownership of, the Franchisee. The Disclosee shall, from time to time as may be requested by the Franchisee, do all things which may be necessary to establish or document the Franchisor's ownership of any such work product.

Franchise Agreement, Exh. B.

*(g) Personal Guarantee*

The personal obligations of Mr. and Mrs. Griffin are outlined in the

Guarantee of the Franchisee's Obligations:

    The obligation of each Guarantor is absolute and unconditional. This is an irrevocable and continuing guarantee; it shall cover and secure any amount at any time owing on the Guaranteed Obligations and shall remain in full force and effect until all Guaranteed Obligations shall have been satisfied and all amounts due have been paid to the Franchisor in full. Each Guarantor waives the benefit of any circumstance, defense or statute of limitation affecting his, her or its liability which might otherwise discharge a Guarantor or hinder prompt enforcement of this Guarantee. Each Guarantor irrevocably waives any requirement that the Franchisor proceed again or exhaust any collateral or security which the Franchisor may now hold or

11

obtain for any of the Guaranteed Obligations prior to collecting from any Guarantor.

Franchise Agreement, Exh. E.

### (h) Remedies in the Event of Breach

Tutor Time seeks injunctive relief pursuant to the following paragraphs of

the Agreement:

> *12.8 Injunctive Relief* . The Franchisee also acknowledges that the Franchisee's violation or breach of covenants contained in Paragraphs 12.1 through 12.6 is likely to cause substantial and irreparable harm to the Franchisor's System and reputation. The Franchisee agrees that the Franchisor is entitled to appropriate injunctive relief, without bond, in the even the Franchisee violates or breaches any of the such covenants.
>
> To the extent required by applicable Indiana law, this section shall not in any way abrogate or reduce any rights of the Franchisee as specifically provided in the Indiana Deceptive Franchise Practices Law. [Note: this paragraph was added under terms of Addendum.]
>
> The Franchisee agrees that the Franchisor may seek appropriate injunctive relief (not without bond), but is not automatically entitled to it pursuant to Indiana Code 23-2-2.7-1(10) in the event the Franchisee violates or breaches any such covenant. [Note: this paragraph was added under terms of Addendum.]
>
> *19.11 Remedies and Costs*. Nothing in this Agreement shall bar the right of the Franchisor or Franchisee to obtain specific performance of the provisions of this Agreement and injunctive relief against threatened conduct that will either cause loss or damage under customary rules of equity. The parties agree that either party may obtain such injunctive relief without bond if such relief is granted by a court of competent jurisdiction.

### (i) Forum Selection Clause

The Addendum to the Agreement contains the following forum selection

clause:

This Agreement shall be governed by the laws of the State of Indiana. The Franchisor and Franchisee acknowledge and agree that all actions arising from this Agreement shall be brought in a United States District Court located in the State of Indiana, without any objection to the jurisdiction or venue of such Court by either party.

### III. Motion to Strike

Tutor Time has moved to strike portions of David Tasch's affidavit submitted by Larzak and the Griffins in support of their summary judgment response. Tutor Time challenges statements made by Mr. Tasch in paragraphs 3-9 of his affidavit as "thoroughly contaminated with his opinions, characterizations and personal beliefs." Mot., ¶ 4.

Federal Rule of Civil Procedure 56(e) governs affidavits presented in support or opposition to a motion for summary judgment and requires that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." If the affiant isn't testifying as an expert, the affiant's testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701.

An affiant need only provide enough facts for the court to determine that the affiant's opinions are "grounded in observation or first-hand personal experience.

They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from [affiant's] experience." <u>Visser v. Packer Eng'g Assocs., Inc.</u>, 924 F.2d 655, 659 (7th Cir. 1991) (en banc). Testimony of trade customs is a matter that can be inferred from observation and experience, <u>Western Indus., Inc. v. Newcor Canada Ltd.</u>, 739 F.2d 1198, 1203 (7th Cir. 1984), and a liberal "chain of inference" is accorded to testimony on matters of trade usage. <u>Rich Products Corp. v. Kemutec, Inc.</u>, 66 F. Supp.2d 937, 965 (E.D. Wis. 1999) (<i>citing</i> <u>Western Indus. v. Newcor Canada</u>, 739 F.2d at 1202).

Mr. Tasch states he has personal knowledge of the facts set forth in his affidavit and he is familiar with trade customs in the child care industry in Lake County based on his ownership of a child care center in Hobart, Indiana. While Mr. Tasch's statements in paragraphs 3-9 may contain some inferences relating to trade customs, his statements are based on his observations and experience in the child care industry and, as such, are not so unreliable to justify being stricken from his affidavit. <i>See</i> <u>Zenith Electronics Corp. v. WH-TV Broadcasting Corp.</u>, 395 F.3d 416, 420 (7th Cir. 2005) (reliable inferences "depend on more that say-so"); <u>United States v. Giovannetti</u>, 919 F.2d 1223, 1226 (7th Cir. 1990) ("All knowledge is inferential, and the combined effect of Rules 602 and 701 is to recognize this epistemological verity but at the same time to prevent the piling of inference upon inference to the point where testimony ceases to be reliable."). Tutor Time's motion to strike portions of David Tasch's affidavit is denied.

IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). On cross-motions, each movant must individually satisfy the requirements of Rule 56. O'Regan v. Arbitration Forums, Inc., 246 F.3d 975, 983 (7th Cir. 2001).

In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Turner v. J.V.D.B. & Assocs., Inc., 330 F.3d 991, 995 (7th Cir. 2003). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in its favor. Lawrence v. Kenosha County, 391 F.3d 837, 841-842 (7th Cir. 2004); see also Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of

events'") (*quoting* <u>Schacht v. Wisconsin Dep't of Corr.</u>, 175 F.3d 497, 504 (7th Cir. 1999)).

V. SUMMARY JUDGMENT ON TUTOR TIME'S COMPLAINT

Tutor Time argues it is entitled to judgment on its claim that Larzak breached various terms of the franchise agreement. Before reaching Tutor Time's claims relating to the specific breaches alleged, the court must address Larzak's argument that the Agreement is invalid and unenforceable because of prior breaches by Tutor Time and Child Care Services. Larzak says that even though certain of its claims of breach by Child Care Services were dismissed (*see* Nov. 17, 2006 Opinion and Order, docket # 45), reliance on those previously extinguished breaches is proper "when those breaches are used as a defense against a party seeking to enforce an agreement." Resp., at 20. The court needn't resolve Larzak's contention that it can rely on previously dismissed claims because even if those claims were still viable, its argument that the Agreement is invalid because of earlier breaches is without merit.

Larzak's claim that breaches by Tutor Time and/or Child Care Services invalidate the Agreement contravenes the unambiguous language governing notice. The undisputed facts show that Larzak never provided written notice to Tutor Time or Child Care Services alleging default or breach of the Agreement, thereby denying them an opportunity to address any such breach or default; nor did Larzak provide written notice to Tutor Time or Child Care Services of its intent

16

to terminate the Agreement based on a failure to cure a breach. Because Larzak and the Griffins continued to operate under the franchise agreement for ten years without providing written notice of any default or breach to Tutor Time or Child Care Services, they can't now disavow the validity of the Agreement from which they benefitted for that length of time. *See* Raymundo v. Hammond Clinic Ass'n, 449 N.E.2d 276, 283 (Ind. 1983) ("A party may not claim benefits under a transaction or instruction and, at the same time, repudiate its obligations"); Anderson v. AAMCO Dealers Advertising Pool, 678 N.E.2d 832, 836 (Ind. Ct. App. 1997) ("[W]here a party receives the benefit of a contract for a period of time, he cannot later disavow its validity. In light of the fact that [franchisees] dipped into the Ad Pool for over eight years without contesting the advertising agreement's validity, principles of equity dictate that they may not now swim away from their obligations under the agreement.").

Larzak and the Griffins haven't alleged or produced any evidence of fraud, misrepresentation, overreaching, undue influence, unjust enrichment or undue advantage that might require the court to refuse to recognize any portions of the Agreement. First Fed. Sav. Bank of Indiana v. Key Markets, Inc., 559 N.E.2d 600, 604 (Ind. 1990). The court must give effect to all provisions of the contract and presume the parties meant the provisions as written. In re Kemper Ins. Cos., 819 N.E.2d 485, 491 (Ind. Ct. App. 2004). Larzak and the Griffins haven't established that the Agreement or any of its provisions are invalid or unenforceable.

## A.  Breach of Covenant Not to Compete

Tutor Time asserts Larzak breached the franchise agreement's covenant not to compete, found in Section 12.5, entitled "Post Agreement Covenant Not to Compete," by opening a similar child care learning center. Tutor Time says Larzak's wrongful actions include opening its Premier facility on the day after the franchise agreement expired, at the same address, using the same telephone number and staff, servicing the same customers, and utilizing a similar curriculum and schedule of activities as the previous Tutor Time franchise. Tutor Time maintains Larzak's Premier facility is sufficiently similar to the Tutor Time franchise to allow the court to determine, as a matter of law, that Larzak's actions constitute a breach of the Agreement. Larzak responds that Tutor Time has no business presence in Indiana or any good will or other interest to protect and so can't prevent a former franchisee from operating a similar, competing business.

Indiana contract law governs the Agreement's terms, and while Indiana courts generally recognize that parties entering into a contract have the right to define their mutual rights and obligations, those same courts have held that

> covenants not to compete are in restraint of trade and are not favored by the law. Noncompetition agreements are strictly construed against the employer and are enforced only if reasonable. Covenants must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest. To determine the reasonableness of the covenant, [the court] must first consider whether the employer has asserted a legitimate interest that may be protected by a covenant. If the employer has asserted such an interest, [the court] then determine[s] whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited. The employer bears the burden of showing that

18

> the covenant is reasonable and necessary in light of the
> circumstances. In other words, the employer must demonstrate that
> the former employee has gained a unique competitive advantage or
> ability to harm the employer before such employer is entitled to the
> protection of a noncompetition covenant.

MacGill v. Reid, 850 N.E.2d 926, 929 (Ind. Ct. App. 2006) (*quoting* Pathfinder

Communications Corp. v. Macy, 795 N.E.2d 1103, 1109 (Ind. Ct. App. 2003)).

Thus, the reasonableness of a noncompete clause is a question of law that "rests

upon facts gleaned from the totality of the circumstances," Glenn v. Dow

Agrosciences, LLC, 861 N.E.2d 1, 9 (Ind. Ct. App. 2007), and is particularly well-

suited for disposition by summary judgment. Sharvelle v. Magnante, 836 N.E.2d

432, 437 (Ind. Ct. App. 2005).


### 1.  Legitimate Protectible Interest

Indiana law recognizes as a protectible interest the good will developed

between a customer and a business and the right of an employer to protect the

good will of a business. MacGill v. Reid, 850 N.E.2d at 929. Elements of good will

include "secret or confidential information such as the names and addresses and

requirements of customers and the advantage acquired through representative

contact." Id.; *see also* Central Indiana Podiatry, P.C. v. Krueger, 859 N.E.2d 686,

693 (Ind. Ct. App. 2007) ("Indiana courts have generally found covenants not to

compete valid when they protect an employer's interest in the good will generated

between a customer and a business, and/or the employer's interest in confidential

information."); Seach v. Richards, Dieterle & Co., 439 N.E.2d 208, 213 (Ind. Ct.

App. 1982) ("It has long been settled that present customers are a protectable interest of an employer.").

Larzak argues that the non-compete covenant is unenforceable under the first prong of the reasonableness test because Tutor Time has no business in Lake County, Indiana, and possesses no confidential information or good will that rises to the level of a protectible interest. Larzak says the names and addresses of Tutor Time customers aren't protectible interests because those names can be found in a telephone book.

Tutor Time responds that its ability to re-franchise in the Schererville area is a protectible interest that has been compromised by Larzak's opening of its Premier facility in the former Tutor Time location. Tutor Time maintains the Tutor Time name and the curriculum, methods, forms, manuals, and other materials used to operate a Tutor Time franchise are protectible interests, as Larzak and the Griffins recognized when they sought to take advantage of those interests to open and operate a successful child care center. Tutor Time asserts, too, that the Tutor Time center customer list can't be found in any book or publication available to the general public and is entitled to protection. Tutor Time says customers are attracted to the Tutor Time name and the services offered by its child care centers, including its confidential and proprietary materials used by the Griffins and Larzak to provide services under the Tutor Time name.

The Agreement defines "Tutor Time" as a service and trademark and the Tutor Time "system" as including its trademarks, methods, materials, and

curriculum. Larzak and the Griffins were granted a license to use the Tutor Time system under the terms of the Agreement, and they agreed and acknowledged that valuable good will attached to the marks and the franchise. The names, addresses, and requirements of Tutor Time's customers, together with the manuals and other materials associated with operating a Tutor Time franchise, are unique to Tutor Time and are entitled to protection as legitimate business interests. <u>Central Indiana Podiatry v. Krueger</u>, 859 N.E.2d at 692.

In addition, the good will established between a child care center and its customers – here, parents entrusting the care of their children to the Tutor Time center – is an important and legitimate interest Tutor Time is entitled to protect. *See* <u>Licocci v. Cardinal Assocs., Inc.</u>, 445 N.E.2d 556, 561 (Ind. 1983) ("Indiana courts have held the advantageous familiarity and personal contact which employees derive from dealing with an employer's customers are elements of an employer's 'good will' and a protectible interest which may justify a restraint."); <u>MacGill v. Reid</u>, 850 N.E.2d at 930 ("In industries where personal contact between the employee and customer is especially important . . ., the advantage acquired through the employee's representative contact with customers is part of the employer's good will, irrespective of whether or not the employee had access to confidential information." (*quoting* <u>Field v. Alexander & Alexander of Indiana, Inc.</u>, 503 N.E.2d 627, 633 (Ind. Ct. App. 1987)). Tutor Time has established that it has a legitimate, protectible interest in its system, the good will of its business, and the confidential materials and information associated with its franchise system.

<u>2.  Scope of Restriction</u>

The court must next determine whether "the scope of the terms protecting this legitimate interest is reasonable in terms of time, geography, and types of activity protected." <u>Central Indiana Podiatry v. Krueger</u>, 859 N.E.2d at 693. The Indiana Deceptive Franchise Practice Act establishes specific time and geographic limitations on covenants not to compete:

> It is unlawful for any franchise agreement entered into between any franchisor and a franchisee who is either a resident of Indiana or a nonresident who will be operating a franchise in Indiana to contain any of the following provisions:
>> Requiring a franchisee to covenant not to compete with the franchisor for a period longer than three (3) years or in an area greater than the exclusive area granted by the franchise agreement or, in absence of such a provision in the agreement, an area of reasonable size, upon termination of or failure to renew the franchise.

IND. CODE § 23-2-2.7-1(9).

Section 12.5 of the Agreement includes a time restriction of two years, and Tutor Time concedes [*see* Tutor Time Memo., p. 9 n.4] that even though Section 12.5 contains a distance restriction of ten miles, pursuant to § 23-2-2.7-1(9) the distance restriction applicable to the non-compete clause is contained in Section 1.1 of the Agreement, that is, "the area of a circle having a diameter of two and one-half (2½) miles measured from the Franchise Center Location, as the central point." The time period and geographic limitation set forth in the Agreement are within the constraints of the Indiana Deceptive Franchise Practice Act and are reasonable.

Additionally, the types of activities restricted in the non-compete clause must not be broader than necessary to protect Tutor Time's good will and business interests. "A non-competition agreement drafted so broadly as to prohibit seemingly harmless conduct is not reasonable in view of all of the circumstances of the particular case. More specifically, a covenant restricting the employee from competing with portions of the business with which he was never associated is invalid." MacGill v. Reid, 850 N.E.2d at 930-931 (*quoting* Seach v. Richards, Dieterle & Co., 439 N.E.2d at 214). Section 12.5 prohibits Larzak from engaging "in a child care business similar to the subject franchise." The covenant doesn't restrict Larzak from operating another business or even from operating another child case business. The scope of the activity prohibited isn't too broad.

### 3.  Public Policy

Even though parties shouldn't be unnecessarily restricted in their freedom to contract, states have an interest in regulating the extent to which parties are allowed to restrain trade through the use of restrictive covenants. Glenn v. Dow Agrosciences, LLC, 861 N.E.2d 1, 14 (Ind. Ct. App. 2007) (*quoting* Harvest Ins. Agency v. Inter-Ocean Ins. Co., 492 N.E.2d 686, 691 (Ind. 1986)). Agreements reached by contracting parties "are not to be held void as against public policy unless they are clearly contrary to what the constitution, the legislature, or the judiciary have declared to be the public policy or unless they clearly tend to the injury of the public in some way." Raymundo v. Hammond Clinic Assoc., 449

N.E.2d 276, 279 (Ind. 1983). The Indiana legislature has declared that a franchise agreement may contain a covenant prohibiting a franchisee to not compete with the franchisor for a period of three years in an area no greater than the exclusive area granted by the franchise agreement. IND. CODE § 23-2-2.7-1(9). The covenant here at issue doesn't violate the statute, and Larzak's summary conclusion that the covenant violates public policy doesn't provide any support for a finding that the covenant would harm the public in some way.

Based on the entirety of the considerations, the court concludes that the covenant not to compete is a valid and enforceable term of the Agreement. The court next must determine whether Larzak breached the covenant.

Tutor Time says the similarities between Larzak's operation under the franchise agreement and its current Premier center include the following: Premier is a child care/learning center operating at the same address and using the same telephone number as the Tutor Time franchise [D. Griffin Dep., at 105]; the Premier center opened using the same director, staff, and management structure as that employed under franchise agreement [D. Griffin Dep., at 104]; the Premier center continues to serve largely the same customer base as it did while under Agreement, with Darcy Griffin estimating that during Premier's first year of operation 70% of its customers were "holdovers" from the previous year with the Tutor Time center [D. Griffin Dep., at 109]; and, like the Tutor Time system, Premier utilizes computers and a methodology and "block curriculum" similar to

that employed under the Agreement [D. Griffin Dep., at 110-111; Paul Dep., at 71-72.].

Larzak argues there is a genuine issue of material fact as to whether it is operating a similar business. Larzak says it purchased new software for use at Premier, developed its own curriculum for the Premier center, and enlarged the building in autumn 2005. Larzak insists the operation of a child care center is not unique to Tutor Time, noting that several other organizations, including the YMCA, operate child care businesses that use similar yet unique curricula. Going into business with any one of these other entities, Larzak says, would have provided it with the knowledge to run a child care center. But Larzak didn't go into business with any other child care center; it operated a Tutor Time franchise, learned through use of the Tutor Time system, and then opened a child care center serving the same customers and utilizing a similar curriculum and business plan. That other child care/learning centers in northwest Indiana employ similar methodologies doesn't negate Larzak's opening and continuing to operate a child care center at the Tutor Time location using a business and instructional plan similar to the Tutor Time franchise in contravention of its express agreement to not do so. The covenant not to compete protects Tutor Time's interests by preventing its franchisees from using the fruits of the franchise system to Tutor Time's detriment, notwithstanding the method of operation of other child care centers.

Larzak's Premier Child Care/Learning Center is a business sufficiently similar to the Tutor Time franchise to constitute a breach by Larzak and the Griffins of the non-competition covenant of the franchise agreement.

### B. Breach of Other Provisions of the Franchise Agreement

Tutor Time also claims Larzak violated Sections 12.6 (Proprietary Materials), 15.2 (Return of Materials), and 15.3 (Actions at Termination) of the Agreement and paragraphs 1 and 3 of the Nondisclosure and Noninterference Agreement (duty of franchisee to return confidential materials to franchisor at termination of franchise) by copying and using several of Tutor Time's forms, manuals, and handbooks for Premier's use.

Larzak hasn't specifically addressed the provisions here at issue, but says in connection with the non-compete clause that the "crucial and essential operations manuals" were returned to Tutor Time's district manager on December 2, 2004. Larzak admits it retained certain materials after the Agreement's expiration, but insists its possession of those materials was inadvertent and unintentional. Larzak asserts the retained items were non-essential materials that it never used in its operation of the Premier center.

Notwithstanding that Larzak claims to have acted in good faith, Larzak retained Tutor Time operating materials (an employee handbook, curriculum information manuals, and a copyrighted songbook) beyond the expiration of the franchise agreement. Larzak didn't transfer the telephone number to Tutor Time

26

as the Agreement required. And Larzak utilized some of Tutor Time's materials and intellectual property beyond the expiration of the Agreement by copying forms,[2] using the Tutor Time enrollment package and customer list, and utilizing similar teaching/learning methods in violation of the Agreement. Those actions by Larzak and the Griffins contravened the bargain struck between the parties and so constitute a breach of Sections 12.6, 15.2, 15.3 of the Agreement and paragraphs 1 and 3 of the Nondisclosure and Noninterference Agreement.

---

[2] Larzak cites to a portion of Sarah Johnson's testimony for the proposition that the Tutor Time forms weren't copied. The totality of Ms. Johnson's testimony on that point supports a different conclusion:

| | |
|---|---|
| Q | Tell me about the transferring forms process. What did you do? |
| A | Well, we obviously had to take Tutor Time's name off of the forms. The State requires us to have accident reports. And we had vacation forms. So, any forms we had that were Tutor Time, we made them ours. |
| Q | Okay. |
| A | By changing the names to "Premier." |
| Q | Okay. Aside from changing the names to "Premier," anything else? |
| A | No. |
| Q | Okay. So, basically, you had the forms with Tutor Time's name on them, take that off, then put Premier's name on them, then – |
| A | No. All new forms were completely typed out. |
| Q | Okay. Those forms were based upon Tutor Time's old forms? |
| A | Yes. But, once again, [the] State requires us to have those forms, so there weren't very many changes that you would be able, you know, to do to those forms, because you have to have specific items on the forms, according to the State. . . . |
| Q | Okay. But the State doesn't provide language with regard to those forms. . . . |
| A | There were forms there when I first started working there, so those were the forms that we've always known. |
| Q | So, you just transferred the information, made sure that all of those forms that the State required were there. |
| A | Correct. |
| Q | Okay. And then you did that by transferring the name over, and then retyping? |
| A | Right. |

S. Johnson Dep., at 29-31. Ms. Johnson stated she used the language from Tutor Time's incident report, vacation form, student pick-up form, and student enrollment package, which included student and parent information sheets and field trip/activity authorization forms, and then transferred the Premier name onto the forms to make sure she had all the forms and language required by the state. S. Johnson Dep., at 32-36.

### C.  *Personal Liability of Richard Griffin and Darcy Griffin*

Tutor Time says Richard and Darcy Griffin should be held personally liable for Larzak's breach of the Agreement based on each having signed a Guarantee of Franchisee's Obligations. Neither Larzak nor the Griffins has alleged or argued that the Guarantee documents are invalid or unenforceable. Accordingly, pursuant to the terms of each Guarantee, Richard Griffin and Darcy Griffin are jointly and severally liable for all obligations and judgments entered against Larzak in connection with its breach of the franchise agreement.


VI. Summary Judgment on Larzak's Amended Counterclaim

Larzak asserts Tutor Time breached the franchise agreement and the Software License Agreement by not providing Larzak with proprietary computer software and updates; Section 2.1 of the Agreement in that the electronic entry swipe cards were easily duplicated and not secure; Section 8.3 of the Agreement by not providing consultations, visits, and continuing assistance from district managers; and the Indiana Deceptive Franchise Practices Act by not providing support and requiring that certain items be ordered only from certain vendors.

Tutor Time says it is entitled to summary judgment on Larzak's amended counterclaim because, first, it didn't breach the franchise agreement or have any notice of any alleged breach and, second, Section 15.4 of the Agreement precludes Larzak from requesting the relief sought in its counterclaim. The court doesn't read Section 15.4 as precluding the franchisee's right to bring suit – a

right conferred not by the Agreement but by law – but instead concludes that Tutor Time's argument that it didn't breach the various provisions of the Agreement is dispositive of the remaining claims of Larzak's amended counterclaim.

### 1.  Software and Software Updates

Larzak claims Tutor Time breached the franchise agreement and the Software License Agreement by not providing proprietary computer software and updates. Tutor Time responds that Larzak's claims relating to provision of the original software in 2000 by Child Care Services were previously dismissed. Tutor Time also says it didn't breach either of the agreements with respect to the provision of software or updates because its software was proprietary, as evidenced by the deposition testimony of Ira Young,[3] and not only did Larzak not notify or complain to Tutor Time that the 2002 update wasn't received, in reality Larzak didn't want the 2002 update, as evidenced by Mrs. Griffin's deposition testimony.[4]

---

[3] Mr. Young testified that the person who created the software program for Tutor Time "took the ProCare platform . . . and then designed it to [Tutor Time's] specifications with [Tutor Time's] requirements, and all of [Tutor Time's] integrated and [Tutor Time's] branded. . . . [F]or example . . . when he designed the sign-in module, what came up when you signed in . . . it came up with Pookie Panda, who was [Tutor Time's] mascot. . . . [I]t was not ProCare. It was a proprietary system to [Tutor Time's] specifications, and [Tutor Time's] integrations, which differed from Pro Care." Young Dep., at 49.

[4] Mrs. Griffin was asked about whether she provided notice to Tutor Time that she hadn't received the software update in October 2002:

Q        . . . So October 2002 comes and passes. You know that you've not gotten it, but you did not provide them with written notice regarding it?

(continued...)

Larzak's allegations relating to Child Care Services' actions or inactions before the July 2002 bankruptcy sale, specifically including allegations about the provision of software as set forth in paragraphs 16, 17, and 18 of the amended counterclaim, were dismissed in the court's November 17, 2006 Opinion and Order. Larzak hasn't challenged Mr. Young's statement that the Tutor Time software was proprietary to the Tutor Time System. Nor has Larzak pointed to any evidence to support a finding that Larzak made Tutor Time aware that it didn't receive the software updates. Larzak's reliance on Mrs. Griffin's unsupported affidavit statements that Tutor Time "recognized" [D. Griffin Aff., ¶ 14] and "was aware" [D. Griffin Supp. Aff., ¶ 27] of significant problems with the software doesn't establish that Tutor Time breached the franchise agreement or Software License Agreement.

## 2.  Electronic Entry Swipe Cards

Larzak says Tutor Time breached Section 2.1 of the Agreement in that the electronic entry swipe cards were easily duplicated and not secure. According to Tutor Time, there's no requirement in the Agreement that Tutor Time provide electronic entry swipe cards. Tutor Time maintains Sections 1.11 and 2.1 obligate it to provide Larzak with the Tutor Time System, which includes teaching and

---

[4](...continued)

A      No. One of the reasons I did not, though, was because when I talked to Puck Manion from Hanover Park, she said we're better off without it, because it was causing more problems than it was helping.

D. Griffin Dep., at 184.

organizational materials, curriculum outlines, software, management, products, and organization forms and guidelines. Tutor Time maintains it didn't breach the Agreement in this regard.

Larzak hasn't provided any support for its assertion that Tutor Time had an obligation to correct the swipe card problem. Larzak hasn't addressed or challenged Tutor Time's claim that Section 2.1 doesn't obligate Tutor Time to provide and/or service swipe cards for Larzak's center. And while Mrs. Griffin states in her affidavit [¶ 15] and in her supplemental affidavit [¶ 31] that Tutor Time "was aware" that the swipe cards weren't secure and were easily duplicated, Larzak provides no support for Mrs. Griffin's statements relating to Tutor Time's knowledge of the problem. Mrs. Griffin's deposition testimony was that she "may have discussed" the issue of the swipe cards with Tutor Time personnel but never provided written notice to Tutor Time. Mrs. Griffin says she thought the swipe cards were an issue Tutor Time should have addressed: "I would have thought that they would have wanted to do that on their own concerning the securities issue." D. Griffin Dep., at 190-191. Mrs. Griffin's opinion that Tutor Time knew about and should have remedied what she considered to be a safety problem doesn't establish a breach of the franchise agreement by Tutor Time.

### 3.  Support and Assistance from Tutor Time

Larzak claims Tutor Time breached Section 8.3 of the Agreement by not providing consultations, visits, and continuing assistance from district managers.

Tutor Time responds that it provided assistance, including district manager support, as evidenced by Mrs. Griffin's deposition testimony, at pp. 59-62, 67-70, that Tutor Time conducted conventions, regular round table conference calls related to operations and marketing, business management meetings and training sessions, back-to-school meetings, and Z-mail correspondence, and established a help-desk.

Tutor Time also maintains the language of Section 8.3 actually defeats, rather than supports, Larzak's claim. Section 8.3 requires Tutor Time to provide "continuing assistance" to Larzak "by means of period visits by a field representative," having an office at its headquarters, and being available for consultation "from time to time," and further specifies that

> periodic visits shall be at the discretion of [Tutor Time]; however, [Larzak] may request in writing additional support either on-site or by other communication means to be reasonable at all times, for which [Tutor Time] shall make itself available in a reasonable time frame after receipt of [Larzak's] request.

Tutor Time says it had no notice that Larzak desired or required additional support or assistance.

Larzak hasn't challenged Tutor Time's claims relating to the support and assistance provided to the franchise. Larzak hasn't alleged it ever asked, orally or in writing, for more support or had its request refused by Tutor Time personnel. Mrs. Griffin said it was her "understanding that the district managers were supposed to offer ongoing support and visit the schools on a regular basis, which didn't happen,"[D. Griffin Dep., at 191], but Mrs. Griffin's understanding of what

Tutor Time was supposed to do isn't sufficient to establish that the steps taken by Tutor Time in terms of support and assistance were a breach of the franchise agreement.

### 4.  Indiana Deceptive Franchise Practices Act

Larzak lastly alleges in Count II of its counterclaim that Tutor Time breached portions of the Indiana Deceptive Franchise Practices Act by requiring that supplies be ordered from certain vendors when those items were available elsewhere for less and by not delivering reasonable quantities of various goods and services within a reasonable time. The relevant sections of the Act read as follows:

> Sec. 2. It is unlawful for any franchisor who has entered into any franchise agreement with a franchisee who is either a resident of Indiana or a nonresident operating a franchise in Indiana to engage in any of the following acts and practices in relation to the agreement:
> (1) Coercing the franchisee to:
> (i) order or accept delivery of any goods, supplies, inventories, or services which are neither necessary to the operation of the franchise, required by the franchise agreement, required by law, nor voluntarily ordered by the franchisee;
>
> \*    \*    \*
>
> (2) Refusing or failing to deliver in reasonable quantities and within a reasonable time after receipt of an order from a franchisee for any goods, supplies, inventories, or services which the franchisor has agreed to supply to the franchisee, unless the failure is caused by acts or causes beyond the control of the franchisor.

IND. CODE § 23-2-2.7-2(1)(i), -2(2).

Tutor Time asserts, based on its arguments related to the issues of software, electronic swipe cards, and support and assistance (discussed above), it didn't breach any provisions of the Act.

Larzak says in its response brief that its claims under the Act aren't limited to the lack of support and concludes that its memorandum "has hopefully shown that there were significant issues from Larzak's point of view with respect to support." Resp., at 23. Larzak's statement is insufficient to establish a violation of the Act. Larzak hasn't argued or provided support for a finding that any goods, supplies, inventories, or services it was required to order weren't necessary to the franchise or required by the franchise agreement in violation of § 23-2-2-7-2(1)(i). Nor has Larzak provided any evidence to establish that Tutor Time refused or failed to deliver reasonable quantities of goods, supplies, inventories, or services "within a reasonable time after receipt of an order" from Larzak in violation of § 23-2-2.7-2(2).

Accordingly, Tutor Time's motion for summary judgment on the remaining claims of Larzak's amended counterclaim will be granted.

## VII. REMEDIES

Tutor Time has requested that a two-year permanent injunction be entered against Larzak. Permanent injunctive relief is available only when the plaintiff demonstrates (1) an irreparable injury; (2) remedies at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the

34

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. eBay, Inc. v. MercExchange, LLC, 126 S.Ct. 1837, 1838 (2006). "An injunction is an extraordinary equitable remedy that should be granted with great caution and used only sparingly." Washel v. Bryant, 770 N.E.2d 902, 904 (Ind. Ct. App. 2002).

Damages are the norm in a contract case, so a plaintiff requesting injunctive relief has the burden of persuading the court that his case is different from the norm. Walgreen Co. v. Sara Creek Property Co., 966 F.2d 273, 275 (7th Cir. 1992). Injunctions are granted not "as a matter of course, but only when the plaintiff's damages remedy is inadequate." Id. at 274. When a permanent injunction is at issue, the plaintiff must show that damages will be a seriously deficient remedy for the harm suffered, not that denial of an injunction would work irreparable harm. Id. at 275.

Neither side has addressed the factors relating to issuance of a permanent injunction. Tutor Time claims the language of the franchise agreement entitles it to injunctive relief: Section 12.8 provides that "[Larzak] agrees that [Tutor Time] is entitled to appropriate injunctive relief, without bond, in the event [Larzak] violates or breaches" the covenant not to compete. The right to injunctive relief, though, "is not contingent upon the text of the agreement. It has long been the law in Indiana that an action seeking an injunction lies in equity and is, therefore,

derived from the common law." <u>Washel v. Bryant</u>, 770 N.E.2d at 906 (*citing* <u>Central Union Tel. Co. v. State</u>, 12 N.E. 136 (Ind. 1887)).

Tutor Time bears the burden of demonstrating entitlement to an injunction and it hasn't done so. Tutor Time's request for injunctive relief will be denied. A hearing on the issue of damages will be scheduled in consultation with counsel. At that hearing, each side should be prepared to address Tutor Time's request for lost profits, specific performance, interest, fees, and costs.

VIII. CONCLUSION

Based on the foregoing, the court

(1) DENIES Tutor Time's motion to strike portions of David Tasch's affidavit [docket # 52];

(2) DENIES the motion of Larzak, Darcy Griffin, and Richard Griffin for partial summary judgment [docket # 53]; and

(3) GRANTS IN PART, DENIES IN PART, and DEFERS IN PART its ruling on Tutor Time's partial summary judgment motion [docket # 51] in the following particulars:

(a) Tutor Time's motion for judgment against Larzak, Richard Griffin, and Darcy Griffin, jointly and severally, on Tutor Time's claim that Larzak breached the franchise agreement's covenant not to compete is granted;

36

(b) Tutor Time's motion for judgment on all remaining claims of Larzak's amended counterclaim is granted;

(c) Tutor Time's request for a permanent injunction is denied;

(d) ruling on Tutor Time's request for lost profits, specific performance, interest, fees, and costs is DEFERRED pending a hearing on its request.

A telephonic status conference is hereby scheduled for Monday, July 16, 2007, at 10:00 a.m. (South Bend time), with the court to establish the call, for the purpose of setting a hearing on the issue of Tutor Time's damages.

SO ORDERED.

ENTERED:   July 6, 2007

    /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court